```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ---------------------------------x
 3  UNITED STATES OF AMERICA,

 4
                            Case No. 19-cr-375
 5       -vs-

 6  LASHAUMBA RANDOLPH,

 7                        Defendant.

 8  ---------------------------------x

 9                        United States Courthouse
                          White Plains, New York
10
                          February 2, 2021
11                        2:33 p.m.

12            ** VIA VIDEO AND TELECONFERENCE **

13
    B e f o r e:
14
                          HONORABLE CATHY SEIBEL
15
                          District Judge
16
    A P P E A R A N C E S:
17
    AUDREY STRAUSS
18       United States Attorney for the
         Southern District of New York
19  DAVID FELTON
    EMILY DEININGER
20       Assistant United States Attorneys

21
    SAPONE & PETRILLO, LLP
22  EDWARD V. SAPONE
         Attorney for Defendant
23
    ALSO PRESENT:
24
    SAMUEL BRAVERMAN
25
```

PROCEEDINGS

```
 1              THE DEPUTY CLERK:  Good afternoon, Judge.

 2              THE COURT:  Hello.

 3              THE DEPUTY CLERK:  Judge, this matter is United States

 4   v. Randolph.  We have on here via video for the government,

 5   Mr. David Felton, and we have on via audio AUSA Emily Deininger.

 6   We have the defendant, Mr. Lashaumba Randolph on via video, and

 7   we have defendant's counsel on, Mr. Edward Sapone, on via video,

 8   and our court reporter, Darby, is on, Judge.

 9              THE COURT:  All right.  Good afternoon, everyone.

10              For some reason I don't see Mr. Randolph.  I see just

11   the icon for him.  Let me try to figure out why that is.  Oh,

12   there he is.  All right.  Good afternoon, everyone.

13              THE DEFENDANT:  Good afternoon, Your Honor.

14              THE COURT:  Our first order of business ought to be

15   the fact that we are doing this proceeding by video rather than

16   in person, and the parties submitted a letter regarding why I

17   should conclude that the CARES Act permits that.  My first step

18   in that process is to talk to Mr. Randolph.

19              Mr. Randolph, have you spoken to Mr. Sapone about your

20   right to have this proceeding in person in court?  I can't hear

21   you.  I think you are on mute.

22              THE DEFENDANT:  Can you hear me?

23              THE COURT:  There you go.

24              THE DEFENDANT:  Okay.  Yes, ma'am, I did.

25              THE COURT:  And do you understand that -- sorry about
```

1  that.  My dog sees something outside.

2          Do you understand that you have a right to have this

3  proceeding in court in person with Mr. Sapone standing beside

4  you?

5          THE DEFENDANT:  Yes, ma'am, I do.

6          THE COURT:  And do you understand that because of the

7  pandemic we can't do that right away, but we could do it in the

8  future?

9          THE DEFENDANT:  Yes, ma'am.  I understand.

10          THE COURT:  And do you understand that if you would

11  like to proceed by video, we can do that with your consent?

12          THE DEFENDANT:  Yes, ma'am.  And I would like to

13  proceed.

14          THE COURT:  Has anyone threatened you or coerced you

15  or forced you to agree with that?

16          THE DEFENDANT:  No, ma'am.  They have not.

17          THE COURT:  All right.  And do you understand that if

18  down the road you are not happy with how things work out, you

19  are not going to be able to raise a complaint that your plea was

20  taken by video means rather than in person?

21          THE DEFENDANT:  I understand that.  Yes, Your Honor.

22          THE COURT:  And do you understand if you need to speak

23  privately to Mr. Sapone during this proceeding, we will make

24  sure that that occurs?

25          THE DEFENDANT:  Yes, ma'am.  Thank you.

PROCEEDINGS                                           4

```
 1              THE COURT:  All right.  And, Mr. Sapone, you have
 2  spoken to your client about these issues?
 3              MR. SAPONE:  Yes, Your Honor, and I am confident that
 4  he fully understands that if he wanted to, we could all be
 5  together.  I could be right next to him.  He really wants to get
 6  on with it, Your Honor.  He prefers to do it this way.
 7              THE COURT:  All right.  And, Mr. Felton, do you think
 8  there is anything further I need to ask Mr. Randolph?
 9              MR. FELTON:  No, Your Honor.
10              THE COURT:  All right.  Well, I find that Mr. Randolph
11  has knowingly, intelligently and voluntarily waived his right to
12  an in-person sentencing.  I also find essentially for the
13  reasons set forth in Ms. Deininger's letter of January 28th that
14  the plea cannot be further delayed without serious harm to the
15  interests of justice given that in-person proceedings are
16  currently in suspense, and the trial is set for three months
17  from now, and the parties already may be at work, and in the
18  short term will have significant pretrial preparation and put in
19  a lot of resources getting ready for a trial that Mr. Randolph
20  doesn't want to have.
21              Further, the victims have an interest in getting a
22  restitution order, if there is to be one, sooner rather than
23  later; and there doesn't seem to be any need for either side to
24  either engage in unnecessary interstate travel during the
25  pandemic or have witnesses do so to prepare for a trial that
```

```
 1  both sides have agreed to avoid.  So I do find that the CARES
 2  Act permits us to go forward by video.
 3          With that, let me ask Mr. Clark to place Mr. Randolph
 4  under oath.
 5  LASHAUMBA RANDOLPH, having been duly sworn, testified as
 6  follows:
 7          THE DEFENDANT:  Yes, sir.
 8          THE DEPUTY CLERK:  Okay.  Please state your full name
 9  for the record and spell it out slowly.
10          THE DEFENDANT:  Lashaumba Randolph.  L-A-S-H-A-
11  U-M-B-A, Randolph, R-A-N-D-O-L-P-H.
12          THE COURT:  Mr. Randolph, do you understand that you
13  are now under oath, and if you answer any of my questions
14  falsely, your false answers could later be used against you in a
15  separate prosecution for perjury or making a false statement?
16          THE DEFENDANT:  Yes, ma'am, I do.
17          THE COURT:  How old are you?
18          THE DEFENDANT:  Forty-five.
19          THE COURT:  How far did you go in school?
20          THE DEFENDANT:  Four-year degree, bachelor's.
21          THE COURT:  So you are able to --
22          THE DEFENDANT:  I am sorry.  Excuse me, Your Honor.
23  That's my dog.  She just opened the door and came in the room.
24  Yeah.  She's got a mind of her own.
25          THE COURT:  That's all right.  Don't worry.  As long
```

1   as she is not distracting you, it's okay with me.

2              THE DEFENDANT:  Yes, ma'am.

3              THE COURT:  All right.  So you said you have a

4   four-year degree?

5              THE DEFENDANT:  Yes, ma'am.

6              THE COURT:  So you are able to read, write, speak and

7   understand English?

8              THE DEFENDANT:  Yes, I am.  Yes, I can.  Yes, ma'am.

9              THE COURT:  Are you now, or have you recently been,

10  under the care of a medical doctor?

11             THE DEFENDANT:  Yeah, I was under -- yes, ma'am.  I

12  mean, I -- I mean, like general care or like not -- no mental

13  issues or anything of that nature.  No.  Not like that.

14             THE COURT:  All right.  Well --

15             THE DEFENDANT:  Like general care physician?  Yeah.  I

16  get a physical every year.  Yes, Your Honor.

17             THE COURT:  Okay.  Beyond, you know, going for your

18  annual checkup, are you being treated for any sorts of

19  conditions or illnesses?

20             THE DEFENDANT:  Well, I am pre-diabetic right now, but

21  I am controlling that with diet and excise, actually.

22             THE COURT:  Okay.  So you are not on any medication?

23             THE DEFENDANT:  No.  I am not.

24             THE COURT:  All right.  And you anticipated my next

25  question, which is:  Are you now or have you recently been under

```
 1   the care of a mental health professional?

 2              THE DEFENDANT:  No, ma'am.  I have not.

 3              THE COURT:  All right.  Have you ever been treated for

 4   any mental illness or any type of addiction?

 5              THE DEFENDANT:  No, ma'am.  I haven't.

 6              THE COURT:  In the past 24 hours, have you taken any

 7   drugs, medicine or pills or drunk any alcohol?

 8              THE DEFENDANT:  No, ma'am.  I don't.

 9              THE COURT:  Is your mind clear today?

10              THE DEFENDANT:  Yes, it is.

11              THE COURT:  Are you feeling all right?

12              THE DEFENDANT:  Yes, ma'am.

13              THE COURT:  All right.  Now I understand you want to

14   plead guilty to Count Two of Indictment 19-cr-375, which charges

15   conspiracy to commit wire fraud; is that correct?

16              THE DEFENDANT:  Correct.  Yes, ma'am.

17              THE COURT:  Have you had a full opportunity to discuss

18   your case with your lawyer and to discuss the consequences of

19   pleading guilty?

20              THE DEFENDANT:  Yes, I have.

21              THE COURT:  Are you satisfied with Mr. Sapone and his

22   representation of you?

23              THE DEFENDANT:  Yes, I am.

24              THE COURT:  Does either counsel have any doubt as to

25   the defendant's competence to plead at this time?
```

PROCEEDINGS                                    8

1          MR. FELTON:  No, Your Honor.

2          MR. SAPONE:  No, Your Honor.

3          THE COURT:  On the basis of Mr. Randolph's responses

4   to my questions, my observations of his demeanor, and the views

5   of counsel, I found that he is fully competent to enter an

6   informed plea at this time.

7          Before I take your plea, though, Mr. Randolph, I am

8   going to ask you questions in order to satisfy myself that you

9   are guilty and that you fully understand the consequences of

10  your plea.

11         First, I am going to describe certain rights you have

12  under the Constitution and laws of the United States, which

13  rights you will be giving up if you plead guilty.  Please listen

14  carefully.  If I say anything that you don't understand, stop

15  me, and either Mr. Sapone or I will explain it further.  Okay?

16         THE DEFENDANT:  Yes, ma'am.

17         THE COURT:  You have the right to be represented by

18  counsel at trial and at every stage of the case, and if you

19  could not afford counsel, counsel would be appointed to

20  represent you for free.  Do you understand that?

21         THE DEFENDANT:  Yes, ma'am.  I do.

22         THE COURT:  You have a right to a speedy and public

23  trial by a jury on the charges against you.  Do you understand

24  that?

25         THE DEFENDANT:  Yes, ma'am.  I do.

1          THE COURT:  If there were a trial, you would be

2  presumed innocent, and the government would be required to prove

3  you guilty by competent evidence and beyond a reasonable doubt.

4  You would not have to prove you were innocent at a trial.  Do

5  you understand that?

6          THE DEFENDANT:  Yes, ma'am.  I do.

7          THE COURT:  If there were a trial, a jury composed of

8  12 people selected from this district would have to find

9  unanimously that you were guilty.  In other words, you could

10  only be found guilty if all 12 agreed that you were guilty.  Do

11  you understand that?

12          THE DEFENDANT:  Yes, ma'am.

13          THE COURT:  If there were a trial, you would have the

14  right to see and hear all of the witnesses against you, and your

15  lawyer could cross-examine them.  You would have the right to

16  have your lawyer object to the government's evidence and offer

17  evidence on your behalf if you so desired, and you would have

18  the right to have subpoenas issued to compel witnesses to come

19  to court if you wanted to call them to testify in your defense.

20  Do you understand that?

21          THE DEFENDANT:  Yes, ma'am.  I do.

22          THE COURT:  If there were a trial, you would have the

23  right to testify if you wanted to, but no one could force you to

24  testify if you did not want to.  Further, no inference or

25  suggestion of guilt could be drawn if you chose not to testify

PROCEEDINGS                    10

1  at trial.  In other words, the jury would be told that it could

2  not hold it against you if you chose not to testify.  Do you

3  understand that?

4          THE DEFENDANT:  Yes, ma'am.  I do.

5          THE COURT:  Do you understand that by pleading guilty

6  today, you will be giving up all the rights I have described

7  except the right to counsel?

8          THE DEFENDANT:  Yes, ma'am.

9          THE COURT:  Do you understand that except for the

10 right to counsel, you are waiving these rights going forward and

11 giving them up for the rest of the case?

12         THE DEFENDANT:  Yes, ma'am.  I do.

13         THE COURT:  Do you understand you will have no trial,

14 and you will be found guilty based just on your plea of guilty?

15         THE DEFENDANT:  I understand.  Yes, ma'am.

16         THE COURT:  Do you understand it's completely your

17 choice whether to plead guilty or go to trial?

18         THE DEFENDANT:  Yes, I do.

19         THE COURT:  Do you understand if you wanted to change

20 your mind right now and decide not to plead guilty, that would

21 be allowed?

22         THE DEFENDANT:  Yes, I understand.

23         THE COURT:  All right.  You have received a copy of

24 the indictment, which is numbered 19-cr-375?

25         THE DEFENDANT:  Yes, I did.

```
 1              THE COURT:  Have you read it?

 2              THE DEFENDANT:  Yes, I did.

 3              THE COURT:  And did you discuss it with Mr. Sapone?

 4              THE DEFENDANT:  I did.

 5              THE COURT:  Did you tell him everything you know about

 6   the case?

 7              THE DEFENDANT:  Yes, I did.

 8              THE COURT:  Do you understand you are charged in Count

 9   Two with participating in a conspiracy to commit wire fraud?

10              THE DEFENDANT:  Yes, ma'am.  I understand.

11              THE COURT:  Mr. Felton, what are the elements of that

12   offense?

13              MR. FELTON:  Your Honor, the elements of the offense

14   are:  First, that an agreement or understanding to commit wire

15   fraud existed between two or more persons; and second, that each

16   defendant knowingly became a member of the charged conspiracy.

17   The government would also need to prove by a preponderance of

18   the evidence that venue was appropriate in the Southern District

19   of New York.

20              THE COURT:  And what are the elements of wire fraud?

21              MR. FELTON:  One moment, Your Honor.

22              THE COURT:  I think I know what they are.

23              MR. FELTON:  Your Honor, I apologize.  My document on

24   the computer is freezing when I am trying to load it, and I

25   don't want to speak inaccurately in response to the Court's
```

```
 1  question.
 2          THE COURT:  All right.  I think I would be shooting
 3  from the hip as well.  I believe it is a scheme or artifice to
 4  defraud or to obtain money or property by means of false or
 5  fraudulent pretenses, representations or promises.  Second, that
 6  the defendant knowingly and willfully participated in the scheme
 7  with intent to defraud, and that a facility in interstate
 8  commerce was used to accomplish the fraud.
 9          Those are the elements of completed wire fraud.  Here,
10  the -- here, the charge is conspiracy to commit wire fraud.
11  Just give me one second, though, and let me check my work on
12  that.
13          MR. FELTON:  Your Honor, I have the document up, and
14  that sounds accurate to me.  I didn't quite catch what you said
15  for the third element, but I have that the defendant used a wire
16  communication in furtherance of the scheme.
17          THE COURT:  All right.  Another way of putting what I
18  said, I think.
19          Mr. Randolph, do you understand if you chose not to
20  plead guilty, the government would have to prove each part or
21  element of that charge beyond a reasonable doubt at trial?
22          THE DEFENDANT:  Yes, ma'am.  I do.
23          THE COURT:  All right.  Now let's talk about the
24  possible penalties.  Do you understand that Count Two carries a
25  maximum prison term of 20 years, a maximum supervised release
```

PROCEEDINGS                                        13

```
 1  term of three years, a maximum fine of the greater of $250,000
 2  or twice the gross gain or loss from the offense, plus a
 3  mandatory $100 special assessment?
 4          THE DEFENDANT:  Yes, ma'am.  I understand.
 5          THE COURT:  Do you also understand that I must order
 6  restitution to any person or entity injured as a result of your
 7  criminal conduct?
 8          THE DEFENDANT:  I understand.  Yes, ma'am.
 9          THE COURT:  Do you understand that supervised release
10  refers to a period of monitoring and supervision following a
11  prison term?
12          THE DEFENDANT:  Yes, ma'am.  I do.
13          THE COURT:  There are terms and conditions of
14  supervised release with which you must comply, and if you do not
15  comply with them, you could be returned to prison without a jury
16  trial.  Do you understand that?
17          THE DEFENDANT:  Yes, ma'am.
18          THE COURT:  Do you understand that if you violate the
19  terms or conditions of supervised release and are returned to
20  prison, the new prison term could be for part or all of the term
21  of supervised release, and you would not get credit for time
22  previously served in prison on your sentence or for time
23  previously served on supervised release?
24          THE DEFENDANT:  Yes, ma'am.  I understand.
25          THE COURT:  Are you a United States citizen?
```

PROCEEDINGS                                    14

1          THE DEFENDANT:  Yes, I am.

2          THE COURT:  Do you understand that your guilty plea

3  may deprive you of valuable civil rights such as the right to

4  vote, the right to hold public office, the right to serve on a

5  jury, the right to hold certain professional licenses, and the

6  right to possess any kind of firearm?

7          THE DEFENDANT:  Yes, I understand.

8          THE COURT:  Do you understand that there are

9  sentencing guidelines that I must consider in determining an

10 appropriate sentence in your case?

11         THE DEFENDANT:  Yes, I understand, ma'am.

12         THE COURT:  Have you talked to Mr. Sapone about the

13 guidelines?

14         THE DEFENDANT:  Yes, I did.

15         THE COURT:  Do you understand that I will not be able

16 to determine the relevant sentencing guidelines range for your

17 case until after a presentence report has been completed by the

18 probation office, and you and the government have had a chance

19 to challenge any of the facts reported by the probation office?

20         THE DEFENDANT:  I understand.  Yes, ma'am.

21         THE COURT:  Do you further understand that even after

22 I determine what guidelines range applies to your case, the

23 guidelines provide me with the ability to depart from the range

24 calculated under the guidelines and to impose a sentence that is

25 above or below that range?

PROCEEDINGS

15

1          THE DEFENDANT:  I understand.  Yes, ma'am.

2          THE COURT:  After I determine the appropriate

3  guideline range, and after I determine whether under the

4  guidelines an upward or downward departure from that range is

5  called for, I will then determine the proper sentence in your

6  case having in mind, not only the sentencing guidelines, but

7  each of the factors set forth in Title 18 United States Code

8  Section 3553(a), a statute that requires me to take into account

9  a number of factors in addition to the sentencing guidelines in

10 considering the appropriate sentence for your case.  Do you

11 understand that?

12         THE DEFENDANT:  Yes, ma'am.  I do.

13         THE COURT:  So even after I determine the guidelines

14 range for your case, I must also consider these other factors,

15 and I might settle on a sentence higher or lower than what the

16 guidelines recommend.  Do you understand that?

17         THE DEFENDANT:  I understand.  Yes, ma'am.

18         THE COURT:  Do you understand there is no parole in

19 the federal system, and you will not be released early on

20 parole?

21         THE DEFENDANT:  I understand that.  Yes, ma'am.

22         THE COURT:  Do you understand that if anyone has

23 attempted to estimate or predict what your sentence will be,

24 their estimate or prediction could be wrong?

25         THE DEFENDANT:  I understand.  Yes, ma'am.

1          THE COURT:  No one, not even your lawyer or the

2    government's lawyer, can or should give you any assurance as to

3    what your sentence will be.  I am going to decide your sentence,

4    and I'm not going to do that now.  I can't do it until after the

5    probation office completes the presentence report, and I have

6    ruled on any challenges to the report, calculated the guidelines

7    range, determined whether there are grounds to depart up or down

8    from that range, and considered all the statutory factors.  So

9    nobody, not even I, can predict what I am going to decide in the

10   future to be the appropriate sentence in your case.  Do you

11   understand all that?

12          THE DEFENDANT:  Yes, ma'am.  I do.

13          THE COURT:  Do you also understand that if your

14   sentence is different from what your lawyer or anyone else told

15   you it might be, or if it's different from what you expect, or

16   if it's different from what's contained in your plea agreement

17   with the government, you will still be bound by your guilty

18   plea, and you will not be allowed to withdraw your guilty plea?

19          THE DEFENDANT:  I understand.  Yes, ma'am.

20          THE COURT:  All right.  Now I have been given a plea

21   agreement, which is signed by the government.  It doesn't look

22   like it's been signed by Mr. Sapone or Mr. Randolph.  It's dated

23   January 21st, 2021.  Is there a signed version somewhere?

24          MR. SAPONE:  This is Ed Sapone, Your Honor.  There

25   certainly is, and the way I would suggest we handle it is either

```
 1   we could give Your Honor permission, if you chose to do that, to
 2   sign, or I could get that copy, dig it up and get it to you
 3   ASAP.
 4            THE COURT:  All right.  Well, why don't you just send
 5   the fully-signed copy to Mr. Clark, and we will have it on for
 6   our file?  It doesn't get publicly filed, anyway.  Let me see if
 7   I know how to screen share.
 8            Walter, you are going to have to teach me.  How do
 9   I -- can I screen share on here?  You're on mute.
10            THE DEPUTY CLERK:  Judge, let me make you a presenter,
11   and that should be able to let you do that.  Just give me one
12   moment.
13            THE COURT:  Okay.
14            (Pause)
15            THE DEPUTY CLERK:  Judge, I don't know why.  I don't
16   know if it's because I am using my phone.  I know if I was doing
17   it on my computer, I could do it.  I'm just trying to figure out
18   how I can do it via my phone, Judge.
19            THE COURT:  And you can't -- you are on your phone, so
20   you can't pull up the plea agreement?
21            THE DEPUTY CLERK:  That is correct, Judge.
22            THE COURT:  I do want to be able to show it to
23   Mr. Randolph.
24            THE DEPUTY CLERK:  I might have an solution, Judge.
25   Let me see if I can go on the computer and -- just give me one
```

PROCEEDINGS

1   moment.

2          THE DEFENDANT:  Your Honor, if it would help you, I

3   mean, I should still have it in my email when they sent it to

4   me.  Would you like me to read it or --

5          THE COURT:  Well, I want to make sure that the one you

6   have and the one that we have are the same one.

7          THE DEFENDANT:  All right.

8          THE COURT:  In the meantime, while we are working on

9   that, let ask you this.

10          THE DEFENDANT:  Yes, ma'am.

11          THE COURT:  The plea agreement that you have, is it

12   dated January 21st, 2021?

13          THE DEFENDANT:  Let me go into my email and pull it up

14   now.

15          THE COURT:  Okay.

16          THE DEFENDANT:  Just one moment.

17          THE COURT:  And, Mr. Sapone, maybe you can tell us

18   if -- I don't know if you've sent one or more versions to your

19   client, but did you send him the January 21 version?

20          MR. SAPONE:  Yes.  So we sent it to him last night,

21   Your Honor, and you should know that as you were speaking with

22   him a few moments ago, I re-sent it.  So he should have it

23   twice.

24          THE COURT:  All right.  And --

25          THE DEFENDANT:  Yes.  Yes, ma'am.

PROCEEDINGS                    19

```
 1              THE COURT:  Is that the first plea agreement that's

 2   gone his way or have there been earlier versions?

 3              MR. SAPONE:  Well --

 4              THE COURT:  I only ask because, you know, what's been

 5   happening in a couple of pleas lately is the lawyer and client

 6   have gone over an earlier version of the agreement in detail,

 7   and this most recent one they only went over the changes.  Is

 8   that what happened here or have you gone over this one in

 9   paragraph-by-paragraph detail?

10              MR. SAPONE:  Right.  So we went over this one in

11   recent time.  This is the one and --

12              THE COURT:  Okay.

13              MR. SAPONE:  -- so he hasn't had any other version.

14   He had this many times over, actually.

15              THE DEFENDANT:  Correct.  I do.

16              THE COURT:  All right.  So I see Mr. Randolph is

17   holding a paper plea agreement.  Is it dated January 21st of

18   this year?

19              THE DEFENDANT:  Yes, ma'am.  It is.

20              THE COURT:  All right.  And did you read this

21   agreement in full?

22              THE DEFENDANT:  Yes, I did.

23              THE COURT:  Did you discuss it with Mr. Sapone in

24   full?

25              THE DEFENDANT:  I did.
```

PROCEEDINGS                    20

1          THE COURT:  And did you sign a version of it and send

2    it back to Mr. Sapone?

3          THE DEFENDANT:  Yes, ma'am.  I did.

4          THE COURT:  All right.  And do you fully understand

5    the agreement?

6          THE DEFENDANT:  Yes, ma'am.  I do.

7          THE COURT:  You discussed everything in it with your

8    lawyer?

9          THE DEFENDANT:  Yes, ma'am.

10         THE COURT:  And, Mr. Sapone, you discussed everything

11   in the agreement with your client?

12         MR. SAPONE:  Yes, I did, Your Honor.

13         THE COURT:  Do you believe he fully understands the

14   agreement?

15         MR. SAPONE:  Yes, I do.

16         THE COURT:  And, Mr. Randolph, do you believe you

17   fully understand the agreement?

18         THE DEFENDANT:  Yes, ma'am.  I do.

19         THE COURT:  All right.  Is the written agreement dated

20   January 21st, does that written agreement contain the complete

21   understanding between and you the government concerning your

22   case?

23         THE DEFENDANT:  Yes, ma'am.  I believe it does.

24         THE COURT:  Is there any promise, agreement,

25   understanding or deal that you have with the government that's

PROCEEDINGS                                21

1    not written down in that plea agreement?

2            THE DEFENDANT:  Not to my knowledge.  No, ma'am.

3            THE COURT:  All right.  So the plea agreement is the

4    whole deal, and there is no side deal?

5            THE DEFENDANT:  No, ma'am.

6            THE COURT:  Well, am I correct that the plea agreement

7    is the entire deal, and there is no side deal?

8            THE DEFENDANT:  Yes, ma'am.

9            THE COURT:  That's correct?  Okay.

10           Has anyone threatened you or forced you or coerced you

11   to plead guilty or to enter into the plea agreement?

12           THE DEFENDANT:  No, ma'am.  They have not.

13           THE COURT:  Besides the government's promises in the

14   plea agreement, has anyone promised you anything or offered you

15   any inducements to plead guilty or to enter into the plea

16   agreement?

17           THE DEFENDANT:  No, ma'am.

18           THE COURT:  Has anyone made a promise to you as to

19   what your sentence would be?

20           THE DEFENDANT:  No, ma'am.

21           THE COURT:  Now, I see that the plea agreement

22   contains agreements or stipulations regarding the sentencing

23   guidelines.  Do you understand that those agreements regarding

24   the guidelines are binding on you, and they are binding on the

25   government, but they are not binding on me?

1          THE DEFENDANT:  Yes, ma'am.  I understand.

2          THE COURT:  I will, of course, consider what you and

3   the government have agreed to in the plea agreement, but I will

4   be making my own determination of your guidelines range.  Do you

5   understand that?

6          THE DEFENDANT:  Yes, ma'am.  I understand.

7          THE COURT:  And do you further understand that under

8   the plea agreement, you are giving up your right to appeal or

9   otherwise attack or challenge the sentence as long as I sentence

10  you within or below the stipulated guidelines range of 51 to

11  63 months' imprisonment?

12         THE DEFENDANT:  Yes, ma'am.  I understand.

13         THE COURT:  And do you further understand that under

14  the plea agreement, you are giving up your right to appeal or

15  otherwise attack or challenge any fine of $200,000 or less, any

16  forfeiture amount of $9,500 or less, and any special assessment

17  of $100 or less?

18         THE DEFENDANT:  Yes, ma'am.  I understand.

19         THE COURT:  And do you further understand that the

20  only exception to these waivers is that you do retain the right

21  to bring claims of ineffective assistance of counsel?

22         THE DEFENDANT:  I understand.  Yes, ma'am.

23         THE COURT:  All right.  Mr. Sapone, do you know of a

24  valid defense that would prevail at trial or any reason why your

25  client should not be permitted to plead guilty?

PROCEEDINGS                                    23

```
 1              MR. SAPONE:  I do not, Your Honor, and he wishes to
 2  accept full responsibility.
 3              THE COURT:  Do you believe there is an adequate
 4  factual basis to support the plea?
 5              MR. SAPONE:  Yes, Your Honor.
 6              THE COURT:  Mr. Felton, do you believe there is an
 7  adequate factual basis to support the plea?
 8              MR. FELTON:  Yes, I do, Your Honor.
 9              THE COURT:  Could you please summarize what the
10  government would prove if the case went to trial?
11              MR. FELTON:  Yes, Your Honor.  My computer issues are
12  behind me, so I will be able to read from what I have prepared.
13              If this case were to proceed to trial, the government
14  would prove beyond a reasonable doubt that Randolph conspired
15  with others, including co-defendant Marvin Williams, to
16  willfully and knowingly commit wire fraud.  Evidence would show
17  that Randolph provided fraudulent VIN stickers and fake car
18  titles to Williams, and that Randolph's conspirators, including
19  Williams, made misrepresentations regarding stolen cars to car
20  purchasers.
21              The government would expect to present the following
22  evidence, among other things:  Signal phone messages between
23  Williams and Randolph in which, among other things, Randolph
24  agreed to and does provide Williams with a fake title and
25  fraudulent VIN label for a stolen Dodge Charger Hellcat.
```

PROCEEDINGS

1      Additional signal messages show Randolph following

2  through with Randolph sending Williams photos of FedEx and

3  mailing receipts for the Dodge Charger Hellcat, fake title and

4  VIN.  As victim and cooperating witnesses would testify, this

5  Dodge Charger Hellcat, for which Randolph provided fraudulent

6  paperwork, was sold by Williams in the Bronx to a car-buyer

7  victim to whom Williams made misrepresentations about the stolen

8  car's history and status.

9      In the signal phone messages between Williams and

10 Randolph, they also discuss a variety of additional fake titles

11 and fraudulent VIN labels for Randolph to provide Williams for

12 stolen cars, including a Ford F-150, a Land Rover Range Rover, a

13 Lamborghini and a Ford Expedition XLT.  In the signal phone

14 messages Williams repeatedly asks Randolph to quote-unquote

15 "decode VINs" for stolen cars where Williams gives Randolph the

16 original VIN; tells Randolph that they need to be decoded and

17 asks Randolph to create fraudulent VIN labels with new numbers.

18 Randolph agrees and repeatedly sends screen shots to Williams of

19 Carfax pages for the stolen cars with new altered fraudulent

20 VINs.

21      In the signal phone messages they also discuss fake

22 titles that Williams received from a different source.  Here,

23 Williams noted that they had been working out in South Dakota

24 for months now, and Randolph responded "Nice."  And later told

25 Williams to be careful and don't mess up a good thing, and

PROCEEDINGS                                    25

1   Randolph added, "I can get other states, then."

2          They discuss Randolph putting fake names such as

3   Navrin Williams, Oscar Williams, and Narvin Williams instead of

4   "Marvin Williams" on mailings Randolph sends to Marvin Williams.

5          In the signal phone messages there are numerous FedEx

6   screen shots, packaged photos and receipts of items mailed

7   between Williams and Randolph, including from an entity

8   controlled by Randolph called Randolph Holdings.  In the signal

9   phone messages Williams also provides Randolph with his banking

10  information, and the next day Randolph tells Williams that he

11  sent a $7,000 wire to Williams.  So that's some of the evidence

12  from the signal messages.

13         The government would also expect to present testimony

14  from a cooperating witness that he was introduced to Randolph by

15  a Florida-based source of stolen cars; that he received numerous

16  fake VIN labels to re-VIN cars and fake titles from Randolph

17  through the mail, and he fraudulently registered approximately a

18  half dozen cars for Randolph with the South Dakota DMV.

19         The government would also expect to present recovered

20  evidence from a search of Williams' residence, including

21  mailings from Randolph, including numerous fraudulent car

22  titles, which Randolph and Williams discuss in phone messages,

23  and which Williams would testify he received from Randolph, and

24  a letter from Randolph to Williams in which Randolph writes,

25  "You or your people did the paperwork for the two Ford trucks."

1   And Randolph further writes that a coconspirator of theirs is in

2   a situation right now, and he wants to keep you a secret.

3           Randolph also writes, "I don't really care.  I just

4   need those titles!" And Randolph also writes, "Maybe we can help

5   each other!!!!"

6           The government would also expect to present bank

7   records and Cash App records showing that Randolph was paid

8   $9,500 from Williams via Cash App.  Randolph's Cash App profile

9   lists Randolph's full name and includes a recognizable

10  photograph of Randolph in an orange shirt.

11          Additionally, the government would also expect to

12  present recordings and transcripts of communications intercepted

13  pursuant to a court-authorized wiretap of a phone used by

14  Williams in which, among other things, they discuss a variety of

15  fake titles and fraudulent VIN stickers for Randolph to provide

16  Williams for stolen cars, including a Ford F-150 SuperCrew and a

17  Chevrolet Corvette.  Both of these cars, for which Randolph

18  provided the fraudulent paperwork, were sold by Williams to

19  multiple car-buyer victims to whom Williams made

20  misrepresentations about the stolen cars' history and status.

21  Williams even drove the Corvette in White Plains, New York.

22          Randolph and Williams were also intercepted discussing

23  Randolph sending Williams counterfeit titles and paperwork from

24  additional states so that they can spread it around a little bit

25  and try something else out and mix it up so that the false

1    paperwork would seem less suspicious to the South Dakota DMV.

2         The government would also expect to present the

3    contents of a phone used by Randolph in which, among other

4    things, Randolph has search and browser history for how to clean

5    titles, how to clean car titles off, how to clean ink off legal

6    documents, and for how to clear title.

7         Among the other evidence would include additional fake

8    titles and VIN labels recovered from victims and stolen

9    vehicles, photographs and other evidence regarding recovered

10   stolen cars, law enforcement testimony regarding physical

11   surveillance, toll records, and a common call analysis showing

12   Randolph was in contact with both Williams and co-defendant

13   Cliphas Belfon, South Dakota Department of Motor Vehicles

14   records, and cell phone location data.

15        Collectively, the evidence would show that Randolph

16   participated in the purchase, sale or transportation of stolen

17   cars worth at least $550,000, but less than $1.5 million.

18        Additionally, bank records and text message

19   communications between coconspirators would show that Williams

20   opened and maintained a bank account in the Bronx, New York,

21   which at least one coconspirator made wire transfers from a bank

22   in Connecticut to fund the purchase of stolen cars in

23   furtherance of the conspiracy.

24        THE COURT:  Thank you, Mr. Felton.

25        Mr. Randolph, can you tell me --

PROCEEDINGS

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  Can you tell me in your own words what you

3  did that makes you guilty?

4          MR. SAPONE:  Your Honor, this is Ed Sapone.

5  Mr. Randolph and I have prepared his allocution, and he has a

6  written version, which are his words with the assistance of

7  counsel.  Could he read from his notes?

8          THE COURT:  That's fine with me as long as you and he

9  went over it, and he adopts everything that's on the piece of

10 paper.

11         Mr. Randolph, it's fine with me if you want to read

12 the summary that you prepared with your lawyer as long as you

13 understand that these are your words and, you know, it all needs

14 to be true.

15         THE DEFENDANT:  Yes, ma'am.  I understand.

16         THE COURT:  Okay.  Go ahead.

17         THE DEFENDANT:  In 2018, I knowingly and willfully

18 agreed with others to engage in a scheme to defraud vehicle

19 purchasers in Westchester County, New York and elsewhere by

20 misrepresenting to them the origins and legal status of

21 identifying information on stolen vehicles.  Some of these

22 misrepresentations were made during telephone calls and text

23 messages, as well as online advertisements.

24         As part of this scheme, I assisted in providing false

25 vehicle identification numbers, titles and bills of sales used

PROCEEDINGS                                    29

 1  in connection with the sale of stolen vehicles.

 2          At the time that I did this, I knew that they were

 3  false.  I knew that what I did was wrong and illegal, and for

 4  that, I am eternally sorry.  And I know I let my family down,

 5  and I know I let myself down and my area down, so I want to

 6  wholeheartedly apologize for that.  And at this time, I'm sorry.

 7          THE COURT:  All right.  Thank you, Mr. Randolph.

 8          Did anybody threaten you or coerce you or force you to

 9  be involved in this activity?

10          THE DEFENDANT:  No, ma'am.  They did not.

11          THE COURT:  Does either lawyer think I need to ask any

12  further questions about the facts?

13          MR. FELTON:  No, Your Honor.

14          MR. SAPONE:  No, Your Honor.

15          THE COURT:  All right.  Let me ask you formally now,

16  Mr. Randolph -- oh, actually, before I get to that, do you admit

17  the forfeiture allegations and agree to forfeit the proceeds of

18  your participation -- sorry.  Let me try that again.

19          Do you admit to the forfeiture allegations regarding

20  Count Two and agree to forfeit to the government the proceeds of

21  the offense?

22          THE DEFENDANT:  Yes, ma'am.

23          THE COURT:  All right.  Now I will ask you formally:

24  How do you plead to the charge in Count Two of Indictment 19-cr-

25  375, guilty or not guilty?

PROCEEDINGS                                    30

1              THE DEFENDANT:  I plead guilty, Your Honor.

2              THE COURT:  Are you, in fact, guilty of that charge?

3              THE DEFENDANT:  Yes, ma'am, I am.

4              THE COURT:  Are you pleading guilty voluntarily and of

5    your own free will?

6              THE DEFENDANT:  Yes, I am.

7              THE COURT:  Because you acknowledge that you are

8    guilty as charged in Count Two, because I find you know your

9    rights and are waiving them voluntarily with an understanding of

10   the consequences of your plea, including the potential sentences

11   that may be imposed, and because I find your plea is entered

12   knowingly and voluntarily, and is supported by an independent

13   basis in fact containing each of the essential elements of the

14   offense, I accept your guilty plea and adjudge you guilty of

15   that offense.

16              As I mentioned, the probation office is going to

17   prepare a presentence report to assist me in sentencing you.

18   You will be interviewed by the probation office in connection

19   with that report.  You can, and should, have Mr. Sapone with you

20   during that interview.  If you say anything to Probation, the

21   information you give must be truthful and accurate.  The report

22   will be important to my decision as to what your sentence will

23   be.  You and your lawyer have the right and will have the

24   opportunity to study the report, to challenge it, and to comment

25   on it before I sentence you.  So it's important that when the

1   presentence report is issued, you read it carefully and discuss

2   it in detail with Mr. Sapone before your sentencing date.  If

3   there are any mistakes, inaccuracies or other issues in the

4   report, make sure you point them out to him so that he can point

5   them out to me before I sentence you; and you and he will also

6   both have the right to speak on your behalf before I impose the

7   sentence, and the date for that will be?

8            THE CLERK:  May 20th, 2021, at 3:30 p.m.

9            THE COURT:  Does that work for everybody?

10           MR. SAPONE:  One moment, Your Honor, please.

11           MR. FELTON:  Yes, Your Honor.

12           THE COURT:  I assume we will be done with Mr. Klein's

13  trial by then; and even if we're not, our trial day only goes

14  until 2:30.

15           MR. SAPONE:  So this is Ed, Your Honor.  I am free

16  because I had his trial from the 10th for a few weeks, so I'm

17  free all that time.

18           THE COURT:  All right.  Excellent.  No application as

19  to bail?  Bail is to be continued?

20           MR. FELTON:  Yes, Your Honor.

21           THE COURT:  All right.  Mr. Randolph, do you

22  understand that all of the conditions on which you have been

23  released up until now continue to apply?

24           THE DEFENDANT:  Yes, ma'am.  I do.

25           THE COURT:  And do you understand the consequences can

```
 1  be very serious if you violate any of those conditions?

 2          THE DEFENDANT:  Yes, ma'am.  I do.

 3          THE COURT:  And do you further understand that if you

 4  fail to appear for sentencing, you will be guilty of a separate

 5  crime called bail jumping for which you could be sentenced to

 6  imprisonment and a fine on top of whatever sentence you are

 7  going to receive for the offense to which you have just pleaded

 8  guilty?

 9          THE DEFENDANT:  I understand.  Yes, ma'am.

10          THE COURT:  All right.  Mr. Sapone, can you contact

11  Probation in the next week or so and arrange for that interview

12  to occur within the next four weeks?

13          MR. SAPONE:  Yes, I will, Your Honor.

14          THE COURT:  And, Mr. Felton, can you make sure that

15  Probation gets the government's summary of the facts within the

16  next two weeks?

17          MR. FELTON:  Yes, Your Honor.

18          THE COURT:  And can you both remember to send

19  hardcopies of your sentencing submissions to chambers?

20          MR. FELTON:  Yes, Your Honor.

21          THE COURT:  All right.  Anything else we need to do

22  this afternoon?

23          MR. FELTON:  Not from the government.  Thank you, Your

24  Honor.

25          MR. SAPONE:  No.  Thank you, Your Honor.
```

PROCEEDINGS                                          33

```
1              THE COURT:  All right.  Thank you all.  Stay healthy,

2  everybody.  See you in the springtime.

3              MR. SAPONE:  You, too, Your Honor.  Thank you.

4              (Time noted:  3:15 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```