```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------x
 3  UNITED STATES OF AMERICA,

 4
                                          19 CR 375 (CS)
 5      -vs-
                                          SENTENCING
 6
    LASHAUMBA RANDOLPH,
 7
                            Defendants.
 8  ------------------------------------x

 9                                  United States Courthouse
                                    White Plains, New York
10
                                    Friday, October 15, 2021
11                                  11:45 a.m.

12
    B e f o r e:
13
                                    HONORABLE CATHY SEIBEL,
14                                  District Judge

15

16  A P P E A R A N C E S:

17
    AUDREY STRAUSS
18      United States Attorney for the
        Southern District of New York
19  DAVID FELTON,
        Assistant United States Attorney
20

21  SAPONE & PETRILLO
    BY:  EDWARD SAPONE, ESQ.
22      Attorney for Defendant

23

24

25
```

1             THE DEPUTY CLERK:  All rise, the Honorable Cathy

2   Seibel presiding, United States v. Randolph.

3             THE COURT:  Good morning, Mr. Felton, Mr. Sapone, and

4   Mr. Randolph.  Everyone can have a seat.

5             ALL:  Good morning.

6             THE COURT:  Let me start by putting on the record what

7   I've received in connection with the sentencing.

8             I have the pre-sentence report, which is dated April

9   26th, 2021; I have Mr. Sapone's sentencing memorandum, which is

10  undated; I have the Government's sentencing memo from October

11  8th; I have a letter just received today dated October 14th from

12  a lawyer named Sarah Jones who represents Mr. Randolph in his

13  Florida case; and I just received a proposed restitution order

14  and consent preliminary order of forfeiture.

15            Is that everything I should have?

16            MR. FELTON:  Yes, your Honor.

17            MR. SAPONE:  Yes, thank you, Your Honor.

18            THE COURT:  All right.

19            Mr. Randolph...

20            THE DEFENDANT:  Yes, ma'am.

21            THE COURT:  Have you read the pre-sentence report and

22  the addendum?

23            THE DEFENDANT:  Yes, ma'am.

24            THE COURT:  Have you reviewed those with Mr. Sapone?

25            THE DEFENDANT:  Yes, ma'am, I have.

```
 1              THE COURT:  Are you satisfied with Mr. Sapone and his
 2   representation of you?
 3              THE DEFENDANT:  Yes, ma'am, I am.
 4              THE COURT:  Mr. Sapone, you've reviewed the
 5   pre-sentence report, the addendum, and gone over them with your
 6   client?
 7              MR. SAPONE:  Yes, I did, your Honor.
 8              THE COURT:  Do you have objections to the factual
 9   material in the pre-sentence report?
10              MR. SAPONE:  No, your Honor.
11              THE COURT:  Does the Government have objections to the
12   factual material in the pre-sentence report?
13              MR. FELTON:  No, your Honor.
14              THE COURT:  All right, then the findings of fact in
15   the pre-sentence report are my findings of fact.
16              I do, however, think that the pre-sentence report
17   could be updated to reflect two things, both the information in
18   Pre-Trial Services's June 29th, 2021, report and the information
19   in Ms. Jones's October 14th, 2021, letter.  There are a number
20   of places where I think if Pre-Trial had updated -- excuse me,
21   Probation had updated this report since April, they would have
22   mentioned that.  All right.
23              The pre-sentence report calculates a different
24   guidelines range than the plea agreement did, and it explains
25   how that came to be, as did the Government in its memo.
```

1          You didn't address that, Mr. Sapone.  I assume that

2    means that you agree that the number is what Probation says it

3    is?

4          MR. SAPONE:  So, your Honor, in terms of a guidelines

5    calculation, yes, because as they say, sometimes something is

6    what it is.  I would ask your Honor to consider, though, as a

7    starting point as we begin our analyses of 3553(a) and the

8    guidelines today is that, you know, the initial crimes that give

9    rise to that criminal history were more than twenty years ago in

10   Florida -- yes.

11         THE COURT:  I'm very open to whatever you're going to

12   say in mitigation.  I just wanted to know if you objected as a

13   guidelines matter.  I know you're going to encourage me to go

14   below the guidelines and tell me all the reasons why I should,

15   but I --

16         MR. SAPONE:  Yes, your Honor.

17         THE COURT:  All right.

18         Does the Government wish to be heard, Mr. Felton?

19         MR. FELTON:  Yes, your Honor.

20         So as set forth in the sentencing memo, the Government

21   respectfully submits that a guideline sentence or the stipulated

22   guidelines sentence here of 51 to 63 months of imprisonment

23   would be appropriate.  I'm not going to spend too much time on

24   the offense conduct.  The Court has sentenced eight of Mr.

25   Randolph's Co-Defendants, including just last week a similarly

1  situated Co-Defendant, Colin Bernett, and this is the ninth and

2  second-to-last defendant the Court will sentence in this case.

3         Nobody is claiming or has ever claimed that this is a

4  capital offense or anything like that, but it still put money in

5  the Defendant's pocket, it deprived car owners of their cars, it

6  defrauded car buyers, it deceived law enforcement and the South

7  Dakota DMV, and collectively it made a mess of car records

8  relied upon by the public and law enforcement.

9         As the Court has said eight times already and may well

10  say a ninth time, this four-million-dollar national stolen car

11  ring harmed anyone paying for or seeking to buy car insurance,

12  raising insurance premiums for all.  Like Mr. Bernett, Randolph

13  had a key role, but not the most lucrative role in this

14  sophisticated fraud scheme.  He created fraudulent identity

15  documents, primarily fake titles, and also fraudulent VIN

16  stickers.  A guidelines sentence is necessary to reflect the

17  seriousness of the offense and to provide just punishment.

18         In terms of relative culpability, the Government

19  believes that Mr. Randolph's role creating these phony identity

20  documents put him roughly in the middle of the scheme above

21  Dixon and Walton, beneath Williams and Ismaeli.  In comparison

22  to Co-Defendant Robert Pinsky, for example, on the one hand,

23  Randolph's responsible for a greater loss amount because the

24  cars that he was involved with through his creation of fake

25  identity documents were ultimately more valuable and there were

1   more of them than the cars Pinsky was responsible for.  On the

2   other hand, the fraud proceeds that Pinsky gained by virtue of

3   his selling stolen luxury cars were higher than Randolph because

4   you get more money, apparently, selling stolen cars, luxury

5   cars, than you do by providing fake car titles.  Ultimately

6   here, it's Randolph's history of car crimes and car arrests and

7   especially the concerning conduct while on pre-trial release

8   that highlight the needs for specific deterrence, the needs to

9   protect the public, and the importance of promoting respect for

10  the law that negatively set him apart from his Co-Defendants,

11  aside from Defendant Bernett, that have been sentenced to date.

12          On the plus side and, certainly, in Randolph's favor,

13  there is a substantial gap since his three prior car convictions

14  which were from roughly twenty years ago in Florida.

15          As the Government learned from the pre-sentence

16  report, you know, he did serve a substantial 50-month sentence

17  in connection with those offenses, so I don't mean to minimize

18  them, but they weren't close in time, they are from a long time

19  ago.  That is worth putting on the record.  On the other hand,

20  you know, he served several years and then he had a whole bunch

21  of additional arrests, car-related arrests, that didn't result

22  in prosecutions in 2005, but even taking that as the starting

23  point, there is a real gap in arrests or any kind of criminal

24  activity between 2005 and 2017 when the charged conspiracy here

25  began.

1          Now, I mean, there is a potential argument, and the

2    Government agrees with it, but that this twelve-year period of

3    law-abiding behavior shows that perhaps this crime here is a

4    slip, some kind of minor blip, and, you know, that he only made

5    $9,500 in demonstrated gain would be another argument in the

6    Defendant's favor.  What undermines this hypothetical argument,

7    however, in the Government's view is, one, the other federal

8    case where he's slated to go to trial early next year in the

9    Western District of Pennsylvania for a very serious car

10   insurance fraud scheme and arson case where he faces substantial

11   penalties.  That charged conduct occurred right around the same

12   time as the scheme here, but that he has another serious federal

13   case pending at the same time is not something you see every

14   day.  Then there is the conduct while on pre-trial release.

15         First I'm going to address the COVID loans as

16   referenced in the pre-sentence report.

17         While on pre-trial release, while subject to not one,

18   but two federal indictments, he applied for three and received

19   two COVID-19 pandemic-related small business loans that he was

20   flatly ineligible for.  He was subject to two federal

21   indictments, and he indicated that he was not subject to any

22   indictments when he applied for all three of those loans.  He

23   applied for $80,000 in loans, so roughly 20,000 in a PPP loan

24   that he did not receive, then he applied for it and received;

25   roughly $20,000 in a PPP loan that he did receive; and then he

1  applied for and received $39,500 in what's known as an economic

2  injury disaster loan, which is another small business

3  administration COVID-19-related loan.  It's not just that he was

4  ineligible for them, he made demonstrably false statements that

5  he was not subject to indictment when he applied for and, in

6  fact, received over $60,000 in fraudulent loans.

7            We don't have venue here.  That's why we didn't

8  supersede.  Otherwise we would have.

9            THE COURT:  Is somebody going to?  Charge this?

10            MR. FELTON:  We've referred the matter to law

11  enforcement in Georgia.  I can't comment; I don't know whether

12  they will or will not.  We have made a criminal referral.

13            It's egregious, awful conduct.  He attempted to and

14  did steal from a limited pool of taxpayer-funded money and for

15  struggling and dying small businesses during a pandemic.  He

16  illegally sought to and did profit from a national emergency,

17  from a global emergency, simple as that.

18            Then we have the Polk County, Florida, car incident.

19  There, while on pre-trial supervision in two federal cases in

20  the state of Georgia, where he's not supposed to leave, he finds

21  himself in Polk County, Florida, in a rental car in his name,

22  three cell phones, $5,600 cash on him, he --

23            THE COURT:  It's the key fobs that are most

24  incriminating.

25            MR. FELTON:  Yes, your Honor, and I will, I will

1  certainly get to that.

2         He -- as detailed in the violation memo which has been

3  incorporated into the pre-sentence report and the underlying law

4  enforcement affidavit, there he went to a car dealership in

5  Florida with another individual and sort of went through what

6  appears to be a ruse attempting to buy an $88,000 car.

7         While the other individual was in the car, Randolph is

8  outside the car, talking to the car dealer, opening the hood,

9  asking a million questions, expressing real interest in buying

10 an $88,000 car in a state that he's not supposed to be in.

11 Ultimately he says, "oh, it's too expensive," and gives back a

12 key fob -- he actually touches the key fob based on the report.

13 Gives back a key fob to the car dealer, says, "thanks," you

14 know, "too expensive, we'll," you know, "we'll be on our way,"

15 but the car dealer realizes that it's not the actual key fob,

16 it's another one, for a different car, and rightfully they start

17 to get concerned that, you know, they're going to take the key

18 fob they have and try and steal the car later.  Randolph is

19 ultimately pulled over with the other person who was in the car

20 with him and several key fobs were found, including the key fob

21 for the $88,000 car that he was pretending that he had an

22 interest in buying.

23         Now, you know, we have this late-breaking news today

24 that, you know, the other person who, you know, had given the

25 cops a false name and had a fake ID is saying it was all him,

1  Mr. Randolph had no knowledge of anything, and, you know,

2  apparently this will be dismissed in Polk County, Florida, you

3  know, in ten days.  And ultimately this admission by his friend

4  and assumption of responsibility by him, I mean, doesn't really

5  change the Government's view.  The Government's view that this

6  is relevant in the Court's, you know, assessing and imposing a

7  sentence is not dependent upon the actual results of the state

8  case in Florida.

9          You know, at a minimum, what is he doing in Florida,

10 you know, pretending to buy an $88,000-dollar car in a state

11 he's not supposed to be in, asking super-detailed questions,

12 opening the hood, touching and passing the key fob back and

13 forth between his -- you know, the Co-Defendant in the Florida

14 case and the person at the car dealership, given the history,

15 the charged conduct in our case, the conduct on pre-trial

16 release with respect to the COVID loans, the twelve car-related

17 arrests, his pending car-related fraud case in the Western

18 District of Pennsylvania, given all of this conduct, the

19 implausibility of what he possibly could be doing there, and all

20 the surrounding circumstances detailed in the violation memo via

21 accompanying police affidavit and what I put on the record here,

22 the Government ultimately does not credit that Mr. Randolph, you

23 know, had nothing to do with this and had no knowledge of what

24 was going on, and, at a minimum, he's violating the Court's

25 order and the Court in the Western District of Pennsylvania's

1  order that he shouldn't be leaving the state without permission,

2  he's associating with someone clearly up to no good in a

3  category of case very similar to the charged offense, you know,

4  months before he's scheduled to be sentenced, so even under the

5  most charitable view of the facts, this is pretty bad conduct.

6              And it's all the more baffling and puzzling and

7  senseless given the Defendant's incredibly impressive and

8  supportive family members and the Defendant's own demonstrated

9  ability to run incredibly successful businesses that can earn

10 him substantial income.  We see from the cooking business that

11 he was generating over $30,000 a month in multiple months.  At

12 the same time, he's engaging in this car scheme, this

13 $88,000-dollar car scheme, on pre-trial release.

14             The only explanation that I can think of is that he

15 can't help himself, he just can't stop committing frauds.  No

16 matter how nice he is and no matter how good he is to his

17 family, and, you know, there's a lot of evidence of that in the

18 Defendant's submission and the pre-sentence report, and we're

19 not disputing that, but he just has a really hard time staying

20 out of trouble, and for all these reasons, we respectfully

21 submit that a sentence within the stipulated guidelines range of

22 51 to 63 months is needed to reflect the seriousness of the

23 offense conduct, but primarily the conduct while on pre-trial

24 release, to deter the Defendant from future offenses, protect

25 the public from the crimes, and promote respect for the law.

```
 1              THE COURT:  Thank you, Mr. Felton.

 2         Mr. Sapone.

 3              MR. SAPONE:  Yes.  Good afternoon, your Honor.  Nice

 4  to see you, nice to see Mr. Felton and Mr. Clark.

 5              Your Honor, when a man sits at a table there on a day

 6  like this, he has a choice, and one choice that he can pick is

 7  to fight about facts, to thumb his nose at the Government, and

 8  the obvious circumstantial evidence on some of these things and

 9  to leave through that door kicking and screaming and arguing,

10  that's certainly one choice that one has, wind up at a Fatico

11  hearing and fight about facts.  Today, of course, is a

12  sentencing proceeding, and another choice that a man who sits at

13  that table has is to not fight about facts, but to show

14  appropriate remorse and acceptance of responsibility, which is

15  the avenue that we will travel by.  We respect this Court too

16  much to do anything else.

17              This is not a case where that man went to trial.  This

18  is not a case where twelve strangers filled into the box, plus

19  four alternates.  He didn't waste anyone's time, he came to the

20  table and he admitted it, and that's what today is going to

21  sound like.  He is very sorry for what he has done, and there is

22  no excuse for any of this.

23              Is it an excuse that in this one-year-long conspiracy

24  that Mr. Randolph appears from the evidence to have joined it in

25  August of 2018, a few moments before the end of November of
```

1  2018; is it an excuse that he joined it only three or four

2  months from the end; no, it is not an excuse.  Is it an excuse

3  that in this elaborate scheme that what he got was $9,500,

4  making the whole thing ridiculous, making the whole thing not

5  worth it, disgracing his family.  We have his Brittany, his

6  wife, and his son Denarius, 26 years of age, here in court.

7  They got in a car, they drove up from the South to support their

8  husband, their father.  Is it an excuse that he did all of this

9  and he put himself in harm's way and he's been sitting in jail

10 over $9,500?  No, it is not.  It is quite sad.  Did he belong in

11 Florida when these events occurred in the car dealership?  No,

12 he belonged at home with his wonderful family.  What he was

13 doing in Florida is not important.  The fact is he was there.

14         I had tried, your Honor, for many months to get proof

15 of what the law firm in Florida, the Jones firm, had told me for

16 many, many, many months, which is the case is going to get

17 dismissed against Lashaumba Randolph and it wasn't until

18 Shawnvy, his brother, who is a lawyer down South, was finally

19 able to prevail upon them and get a letter to the same effect.

20 Does the circumstantial evidence of that incident look good for

21 him?  Of course, it does not and that's why we're not going to

22 fight about facts, but I will say that that is not a case where

23 he was convicted, and I will take people at their word and it

24 looks like it's getting dismissed, so whatever that means to

25 your Honor, you're the one who will decide the weight of that.

1          Your Honor, this is about, in my humble opinion, two

2   words, which is grace and mercy, and we're never going to find

3   those words in 18 U.S.C. 3553(a), but I believe that grace and

4   mercy are built into the American criminal justice system, it's

5   in there throughout, throughout those seven paragraphs of the

6   statute, and what I mean by that is, it is always the most

7   broken in society, the people who need the most help, the people

8   who maybe needed a program or they needed a psychologist to

9   assist them and they never got it, that wind up walking from the

10  back door out and sitting at this table.  It's not the

11  successful ones, it's not the ones who didn't need a helping

12  hand, or else none of us would have a job, so these are the

13  folks that we are here to assist.  It is easy to have a heavy

14  hand in these cases and prison is not always the solution, so

15  what I'm asking for, without excuse because there is none, is

16  for grace and mercy.

17          Now, let's talk about the whole person for a moment,

18  and I know you read my papers, but it's worth leaning into just

19  for a few minutes.

20          I believe that there is a continuum that leads people

21  to sit in those seats.  In other words, oftentimes we look at a

22  childhood and how someone is raised and his or her experiences,

23  and it is not hard to see how they wind up in a courtroom like

24  this.  Lashaumba Randolph grew up under horrific circumstances

25  with a father, most respectfully, who was addicted to drugs, who

1  could never keep his finances straight, who would come home drug
2  induced and drunk and beat the oldest child, and we know it from
3  the letters and I certainly know it from the dozens of hours
4  I've spent speaking to Shawnvy, Mr. Randolph's younger brother,
5  who somehow made it in life and became a lawyer, but still looks
6  up to his older brother Lashaumba.  Lashaumba was the one beaten
7  with cords, Lashaumba was the one beaten with belts, Lashaumba
8  was the one who as a teenager would go and mow lawns in affluent
9  Miami, in South Beach, for rich people so he could bring money
10  home to feed his siblings and help his mother pay the bills
11  because Dad was not around, Dad was in jail, sometimes from
12  domestic violence, not only against Mom, but against Lashaumba.
13  Lashaumba was the one who would go and work at concession stands
14  at Dolphins Stadium to bring money home.
15          Now, why is this relevant.  It's relevant because I
16  believe, your Honor, there is a continuum that sometimes when
17  people have a childhood like that, things stick with them, and
18  so what stuck with Lashaumba that I believe brings him here?
19  Never by way of excuse, but always by way of explanation, how
20  could an otherwise wonderful man who is good to his wife and
21  good to his son and good to his eight-year-old daughter wind up
22  doing these things?  Is he inherently evil?  Or is this some
23  issue that maybe could be fixed so that at 46 and he goes off
24  into his fifties, maybe these things don't get repeated.
25          According to his brother, who is a very smart lawyer,

1  he believes that older brother Lashaumba has a money insecurity,

2  which is he had money because he always worked so hard, but

3  always felt that it wasn't enough.  Why would Lashaumba Randolph

4  feel, he's not a stupid man, that the money he earns

5  legitimately from his hard work and paying taxes and supporting

6  his family is not enough?  I believe he could benefit from

7  psychiatric counseling, that is, although there was never enough

8  growing up, although there was serious poverty in the home,

9  although that man who as a boy cried himself to sleep every

10  night how are we going to pay the rent, Dad's not around and

11  when he is, he's beating us, it stuck with him, and it's very

12  difficult sometimes to get rid of it.

13         I've been doing this for twenty-one years representing

14  people and I've seen patterns, and it always starts with the

15  childhood and it's very sad, and had he had one program to maybe

16  help him, then maybe we wouldn't be here, maybe this could all

17  be avoided, but maybe there's always light at the end of the

18  tunnel because there is grace and mercy, and so, your Honor, we

19  ask how could the sentence which I am seeking, which I

20  appreciate is a substantial variance from where I'm asking you

21  to start your analysis, given the age that brings the criminal

22  history into play, I was about to say earlier, I'd ask you to

23  begin the analysis at 51 to 63 as the Government and I are

24  asking you to do, and then from there, I'm asking for a serious

25  variance.

1          How could the law be respected with such a result,

2  especially with other Co-Defendants in the case, which always

3  makes it difficult for me, and what I say is this.  In some

4  cases the law is respected, in other words, there's a promotion

5  of respect by a sentence when it is a heavy-handed sentence, and

6  some of those cases include violent cases or drug cases or gun

7  cases, cases like those, but, your Honor, in the financial

8  crimes cases where, thankfully, in this case, a lot of the

9  restitution has already been paid and we're down at the $26,098

10  mark, which is great for victims, I believe that the law could

11  be respected, in other words, your Honor's sentence could

12  promote respect, when there is grace and mercy.  When a family

13  who is trying to get on and stay together and keep these

14  businesses afloat, and there is no doubt that that man knows how

15  to work hard, that maybe a lighter sentence can promote respect

16  for the law because we don't always have to be so heavy handed,

17  and that's what I'm asking for and that's what I'm suggesting.

18          In terms of the need to avoid disparity in sentences,

19  your Honor has the ability to do whatever you want today.  The

20  sentences in this district and all over the country in cases

21  like these for similarly-situated people, because we sentence

22  the whole person, are all over the board, and I note that

23  Bernett, while on supervision, had engaged in a horrific car

24  crash where I think it dropped twenty feet from one level to

25  another, almost killing people, and so, yes, Lashaumba shouldn't

 1  have been in Florida and the PPP stuff and the open case in

 2  Pennsylvania, there's no doubt about that, but when you look at

 3  the danger to society in these things -- and, by the way, he's

 4  going to have to pay the loans back.  It's not like he stole

 5  money.  It's not a grand larceny.  He got loans that he has to

 6  pay back, although there's nothing correct about that, and

 7  that's why, your Honor, I think it's different from Bernett.

 8              In terms of just punishment, sometimes the sentence

 9  with someone who's healthy, with someone who has nothing else to

10  talk about in terms of how will he spend his time in prison is

11  very straightforward, but this one is different because this man

12  weighs 365 pounds, and every time he puts his neck and his

13  shoulders and his back on the thin BOP mattress, and he's been

14  living this way for four months at the Westchester County Jail,

15  he is in writhing pain and there is nothing they can do for him.

16  He is too heavy to be supported by those beds, and with his

17  physical condition, every night is like hell.

18              Now, is that anyone's fault?  No, it's Mr. Randolph's

19  fault because he is the one who put himself in that bed, but

20  every night that he lies down is like that for him, and as much

21  time he spends in the BOP, that's just the way it's going to be.

22              THE COURT:  Well, maybe BOP has better mattresses than

23  Westchester County.  He's not in BOP yet.

24              MR. SAPONE:  No, you're right about that, but I've

25  also gotten complaints my whole career about the BOP mattresses

1  also, so maybe they're a little better, but not much.

2          THE COURT:  Sometimes they give you two if you have a

3  back problem.

4          MR. SAPONE:  I hope so.

5          With respect, your Honor, to general deterrence, I

6  think the studies show, respectfully, that it is not the length

7  of the sentence that deters the people out there, it's the

8  certainty of the sentence.  In other words, anyone in

9  Lashaumba's position looking at this case, whatever dozens of

10  months he gets as a sentence, is not going to say, well, oh, if

11  it was that dozen months, I wouldn't do it, but because it's

12  this dozen months, I will commit the crime.  It's the fact that

13  it is a felony conviction, it's the fact that he's going to

14  prison, and it's that certainty that deters people if they're

15  deterred at all.  Those are the studies that I am aware of, that

16  the number is not what deters people.  But he's gotta be

17  specifically deterred, no doubt, because my ears were wide open

18  earlier and I know the case, no doubt about it, but that's why

19  the sentence that I'm asking for will specifically deter him,

20  because he'll be in prison for years and years and years and

21  then he'll come out, and I'm asking for the maximum three years

22  supervised release during which he will be supervised, and if he

23  does anything wrong, then he goes right back into the BOP if

24  your Honor chooses that, so my point is specifically there will

25  be years and years and years of specific deterrence if your

1  Honor should fashion a sentence below these guidelines.

2          Your Honor, we have these three businesses, the many,

3  many-acre farm that provides sustainable food for the community,

4  we have I call it the roving restaurant, the restaurant on

5  wheels, that goes out and, again, feeds the community with

6  wonderful organic food, and the tow truck company.  His wife has

7  explained to me that she is doing what she can and thinks she

8  can continue to hold on for some time, although when Mr.

9  Randolph was home, they were doing so much better financially

10  because, really, what she does is she cooks.  She's not the

11  manager, she's not the one who brings in business.  She is an

12  excellent chef, and has had a very difficult time raising an

13  eight-year-old and also assisting Mr. Randolph's 26-year-old son

14  who lives at home, and she said that she could hold on for some

15  time, but not for a guidelines sentence amount of time.  They

16  will lose all three businesses for sure.  And so what I'm asking

17  for is, although I understand that this is not pre-2005 and

18  these are not, quote, unquote, extraordinary family

19  circumstances I might have been asking you for sixteen years

20  ago, I'm asking you to consider the whole person and all the

21  circumstances and impose grace and mercy upon Lashaumba

22  Randolph.

23          Thank you, Your Honor.

24          THE COURT:  Thank you, Mr. Sapone.

25          Mr. Randolph, if there's anything you'd like to say

1 before I sentence you, I will hear you now.

2           THE DEFENDANT:  Yes, ma'am.  Thank you this morning

3 for giving me an opportunity to address the Court and address

4 you.

5           The first thing I would like to say is I want to

6 apologize to your Honor, to the Government, to this community

7 here in New York, and, most importantly, I want to apologize to

8 my family, my wife, and my son.  I want to apologize to you for

9 not being the man that I needed to be, not providing the proper

10 example for you in doing the things that I needed to do in my

11 life.

12          I just want to apologize to you and let you know that

13 from this day forth, I'm going to work to be the best man that I

14 can be, for my family, for my community, for the kids that I

15 mentor from time to time, Mr. Sapone in the guidelines sentence

16 that we asking for, the hundred hours of community service, but

17 I plan on making that not just as a requirement for the

18 sentence, but a requirement for life.  That way I can give back

19 to other people to hopefully help them make smarter and better

20 choices in their lives.

21          And I know that we met under these unfortunate

22 circumstances, your Honor, but I just want to let you know that

23 I plan on coming back and sending correspondence to you to let

24 you know that even though this is an unfortunate situation that

25 I find myself in, I'm going to try to find the good in it, to

Sentencing                    USA v. Randolph

1  make my situation the best it needs to be, and to hopefully give

2  back to other people so when it's finally said and done, when

3  you decide to step down off the bench and you can look back over

4  the people and the lives that you've touched, you can say that I

5  was definitely one of the individuals that you were able to

6  touch and point in the right direction because I want to be able

7  to be an example for my family and for my community, and it

8  starts with me today taking responsibility for my actions and

9  doing what I need to do, because it's, it's just hard hearing

10 your life put before people...like that and you just realize the

11 things that you did and positions that you put yourself in.

12         And I just wanna turn and apologize to my wife and my

13 son, I'm sorry, I apologize to y'all, I'm sorry, I didn't mean

14 to do this to you all, I know I let you down and I apologize.

15 I'm sorry, I'm sorry.

16         I'm sorry, I'm sorry, I'm sorry, I'm sorry.

17         (Brief pause)

18         THE DEFENDANT:  This is not the man that she married,

19 and I gotta do better, I wanna do better, I need to do better.

20 I'm gonna do better.  I promise you.  I promise you that.  I

21 promise you this ain't the last time you gonna hear from me,

22 your Honor, and I mean that in a positive way, not a negative

23 way.  I mean that in a positive way.  Because I'm going to take

24 this opportunity and turn this negative into a positive, and I'm

25 going to try to touch people lives and hopefully get my life

1  together in the process and use my example as my testimony to

2  try to help other people get theirs together, 'cause I

3  apologize, I didn't want my -- I embarrassed my wife and I

4  embarrassed my son and I embarrassed my kids, and I apologize to

5  them.  I'm sorry.  I apologize to the community, I apologize to

6  the Government, I apologize to you, and I'm sorry.

7          I wanted to say a couple of words today, but...I'm

8  sorry, I'm sorry.  I apologize, I'm sorry.  I'm sorry.  Oh, God.

9  Oh, man, I feel, I feel so ashamed right now y'all watching and

10 looking at me crying.  I'm sorry.  Oh, I'm sorry.  I apologize.

11 I apologize.

12          THE COURT:  Okay, thank you, Mr. Randolph.

13          I have to start with the sentencing guidelines -- I'm

14 sorry, was there more you wanted to say?

15          THE DEFENDANT:  No, I'm fine, your Honor, I'm sorry.

16 Continue.  I'm sorry.

17          THE COURT:  No need to apologize.

18          I have to start with the sentencing guidelines.  They

19 are only advisory, but they are a starting point, and they are

20 not in dispute.

21          The base offense level is 7.  Because the loss amount

22 exceeded $550,000 -- one sec.

23          (Brief pause)

24          THE COURT:  Yeah, the pre-sentence report says 500,

25 but that's a mistake.

1           -- $550,000, but less than 1.5 million, the base

2    offense level is increased by 14 levels, and two more levels are

3    added because there were at least ten victims.  Two additional

4    levels are added because the offense involved sophisticated

5    means, specifically the creation of fraudulent paperwork like

6    fake VIN stickers and car titles, and that the Defendant

7    intentionally engaged in that conduct.  Two more levels are

8    added because it involved an organized scheme to steal or

9    receive stolen vehicles or vehicle parts.  That takes us up to

10   27.  Three levels are subtracted for the Defendant's timely

11   acceptance of responsibility, and he's at offense level 24.

12           He has several prior convictions.

13           He has a 2000 conviction for grand theft which

14   involved a stolen vehicle with an altered VIN and a phony

15   registration.  The Defendant's probationary sentence was revoked

16   and he was sentenced to 50 months for failing to pay the cost of

17   supervision, getting rearrested, resisting arrest, and failing

18   to pay restitution.

19           He had a 2001 conviction for very similar conduct,

20   again, a high-end car, which was stolen, an altered VIN number,

21   and a second vehicle.  The probationary term there was revoked.

22   These all count separately because they're intervening arrests,

23   same with the third conviction, which, again, same thing...or

24   same general thing, a stolen vehicle.  This time the Defendant

25   took off, lost control of the vehicle, crashed it, fled on foot,

1  and gave a false name, so each of those three convictions was

2  originally a probationary -- the first two were originally a

3  probationary sentence, but they all became 50-month sentences

4  and they're each 3 points, so it's a criminal history points of

5  9 and criminal history category 4.

6          Then he has a pending case in the Western District of

7  Pennsylvania involving an insurance fraud scheme and an arson.

8  Whether he did that or not I don't know.  I would imagine if he

9  is convicted, whatever sentence he receives there will be on top

10 of whatever sentence I give him.  I'm not going to take that

11 into account and it is not taken into account in criminal

12 history.

13         Also not taken into account in criminal history are

14 eleven other arrests between 1994 and 2005, seven of which were

15 dismissed and four of which were consolidated with other cases.

16 Every one of them is...similar, stolen vehicles, altered

17 paperwork, but none of them resulted in convictions.

18         Until his arrest in 2018 for this case and the

19 Pennsylvania case, the Defendant had been out of trouble since

20 2005, hadn't been arrested since 2005, and yet here he is in a

21 world of trouble for -- with two pending federal cases and

22 probably a third one on the way.

23         The sentencing guidelines range is 77 to 96 months, so

24 about six-and-a-half to eight years.  Whether I should sentence

25 within, above, or below that range turns on the 3553(a) factors.

1  The first is the history and characteristics of the Defendant.

2       And I have to say that Mr. Randolph is one of the most

3  confounding defendants I've come across.  He had what sounds

4  like a brutal childhood, with a father who was abusing drugs and

5  abusing his mother and abusing him, and it appears that there

6  were stretches of time where his father was in jail, stretches

7  of time where the children were sent to live with their

8  grandmother.  His mother somehow miraculously got an education

9  and a good job and his father miraculously got clean, but that

10 wasn't until after he was -- the latter wasn't until after the

11 Defendant was grown, so it has to have been terrible to be

12 raised in those circumstances, and it makes perfect sense that

13 as the oldest child, Mr. Randolph would feel responsible and

14 might, as his brother posits, develop some unhealthy ideas about

15 the need for money, but we know that for a long period of time,

16 Defendant was not in trouble, and then we know he returned to it

17 in a big way.  By the way, I skipped over the nature and

18 circumstances of the offense.

19      This Defendant didn't make very much money, but he

20 caused a lot of damage.  For the reasons described by Mr.

21 Felton, which I won't repeat, these crimes have cascading

22 effects and caused the loss of greater than a half a million

23 dollars, and this Defendant pocketed less than 10,000.  It's not

24 the crime of the century, it's only money, nobody died, and the

25 Defendant -- it was a particularly bad choice for him to get

Sentencing                    USA v. Randolph

1   involved because although he didn't make a lot of money, he was

2   a very key part of the ring.  I mean, the others couldn't have

3   succeeded without people like Mr. Randolph to give them phony

4   paperwork, so while I don't -- I think I've said for everybody,

5   it's not the crime of the century, particularly confounding in

6   Mr. Randolph's case as to why he would even get involved for so

7   little money, but I think we can tell there was a period in this

8   time between the 90's and 2005 where he had, let's say, an

9   unhealthy interest in cars, and he was able to control that

10  between 2005 and 2018 when he went back in business, which is a

11  shame.  It's particularly a shame because the Defendant has,

12  among other things, certain attributes that a lot of people I

13  sentence do not have.

14          His siblings are successful and supportive.  He has a

15  wife who's obviously very talented and who's standing by him.

16  He's got a grown son who's standing by him.  And he has acumen,

17  he has successfully run businesses, and he seems to have people

18  who love him.  You know, the letters I've gotten...you know,

19  some of them, heh, I have to say, show a little denial about the

20  Defendant's past, but they describe somebody who's kindhearted

21  and warm and beloved and who really bounced back from a terrible

22  childhood, and, you know, if you told me that somebody who grew

23  up the way Mr. Randolph grew up, you know, beat his wife and,

24  you know, had horrible anger issues and, you know, was

25  impulsive, I wouldn't be at all surprised, but it sounds like

 1 he's none of those things.  He seems to be a loving husband,

 2 there's no case of violence, and the crimes he commits are ones

 3 that require planning, so in many ways, he's surmounted the bad

 4 experience of his childhood, but in other ways, he clearly has

 5 not, and I think he could benefit from assistance from a mental

 6 health professional.

 7          You know, the elephant in the room, of course, is the

 8 conduct while on pre-trial release, and this I cannot

 9 understand.

10          You know, it may be that the authorities in Polk

11 County are petrified by the Co-Defendant's exculpatory statement

12 and plan to drop the charges against Mr. Randolph.  That

13 certainly wouldn't happen here, heh, regardless of what the

14 Co-Defendant says.  The facts that are not disputed make a very

15 makeable case against Mr. Randolph and certainly sufficient for

16 me to find by a preponderance of the evidence that he was up to

17 no good on supervised release.  He had no business being in

18 Florida in the first place.  It seems pretty obvious what he was

19 doing there; he was doing more of the same.  He and his buddy

20 were going into car dealerships and one of them was distracting

21 the salesman while the other one was swapping out the key fob,

22 and that's why multiple key fobs for additional vehicles were

23 found in the car when they were stopped.  Obviously Mr. Randolph

24 was in no position to really buy an $88,000 car, and given his

25 track record, it was quite obvious what was going on.

1          The part I cannot figure out is why would you take

2    that chance.  This occurred after the Defendant had pleaded

3    guilty, so he knows he's going to face a sentencing judge.

4    It's, it's...it just doesn't make sense.  And it concerns me

5    that Mr. Randolph has gotten to this age in his life and is

6    incapable of making the right decision for himself.  As the

7    Government points out, at the very least he had no business

8    being in Florida at all, but what he was doing there is even

9    worse.

10         And even worse than that is the loan fraud.  I mean, I

11   understand that...the controls on these loans weren't what they

12   should have been and, therefore, people in the community and

13   people on the internet were telling everybody how easy it was to

14   get free money, but it is disgraceful conduct, and the Defendant

15   did it repeatedly.  To take advantage of a national and

16   worldwide emergency, to take advantage of a program that's

17   designed to help businesses stay afloat just to line your

18   pockets when you're not eligible and you know you're not

19   eligible because you have not one, but two pending indictments,

20   it's...it's very bad conduct, and, again, it's inexplicable, if

21   you're thinking rationally, why you would you take a chance like

22   that when you know you're going to face a sentencing judge just

23   makes no sense.

24         You know, Mr. Randolph runs a business, runs several

25   businesses.  He knows how to think things through.  He knows how

1  to weigh pros and cons.  He knows how to decide whether an

2  investment is a good idea or a hire is a good idea or a purchase

3  is a good idea, and yet when it comes to his own conduct, he

4  cannot figure out what's a good idea or what isn't.  I'm sure he

5  figured he was going away and he wanted to leave his family in

6  good financial shape, but he did the opposite and it was

7  completely predictable that it would do the opposite, so I

8  understand why today Mr. Randolph feels so regretful and so

9  ashamed; he's got stuff to be regretful and ashamed about.

10          I have to consider the seriousness of the offense.

11  I've already discussed that.

12          I have to consider promoting respect for the law.

13  That is a huge issue with Mr. Randolph who clearly doesn't stop

14  to think that what he's doing is against the law, he doesn't

15  think about that he's under court supervision, he seems to think

16  the rules don't apply to him.

17          I have to consider just punishment.  I have to

18  consider deterrence.  I'm not sure Mr. Randolph can be deterred.

19  If people on bail for two federal offenses wasn't enough to

20  convince Mr. Randolph to be law-abiding, knowing he was going to

21  face a sentence judge, I'm not sure what would, but there is the

22  issue of general deterrence.

23          Protecting the public from further crimes is an issue.

24  You know, you commit several new crimes or two new crimes --

25  well, several because there were a number of false applications.

1  If you commit several new crimes while you're awaiting sentence,

2  that creates a real concern about the need to protect the public

3  from further crimes.

4           I've considered the guidelines of 77 to 96 months.

5  I've considered all of the 3553(a) factors, even the ones I

6  haven't discussed.

7           The mitigation here is the Defendant's upbringing and

8  the offense and his role in it, but they're -- on the flip side

9  is the aggravating conduct while on release.  I'm going to go

10 below the guidelines.  I'm not going to go nearly as low as Mr.

11 Sapone asked me to do.  The lowest number that I can live with

12 is 60 months imprisonment.  That's going to be followed by three

13 years supervised release under the following conditions:

14          First, the mandatory conditions, you will not commit

15 another federal, state, or local crime; you will not unlawfully

16 possess a controlled substance; you'll refrain from any unlawful

17 use of a controlled substance; you'll submit to one drug test

18 within fifteen days of release from imprisonment and at least

19 two more thereafter; you'll cooperate in the collection of DNA

20 as directed by the probation officer; you will make restitution

21 in accordance with 18 U.S.C. §§ 3663, 3663(a), and 3664; you'll

22 comply with the standard conditions of supervision 1 through 12,

23 along with the following special conditions:

24          You'll provide the probation officer with access to

25 any requested financial information.  You will not incur new

1  credit charges or open additional lines of credit without the

2  approval of the probation officer unless you are in compliance

3  with the installment payment schedule, which I'll describe

4  momentarily.  You'll submit your person and any property,

5  residence, vehicle, papers, effects, computers, other electronic

6  communication or data storage device, cloud storage, or media,

7  to search by any probation officer, with the assistance of law

8  enforcement if needed.  The search is to be conducted on

9  reasonable suspicion concerning a violation of a condition of

10  supervision or unlawful conduct by the Defendant.  Failure to

11  submit to search will be grounds for revocation of release.  Any

12  search must be conducted at a reasonable time and in a

13  reasonable manner.  You shall warn any other occupants that the

14  premises may be subject to search pursuant to this condition.

15         If the probation officer determines based on your

16  criminal record, personal history, or characteristics that you

17  pose a risk to another person or organization, the probation

18  officer, with prior approval of the Court, may require you to

19  notify the person or organization about the risk, and you must

20  comply with that instruction.  The probation officer may contact

21  the person to confirm the notification or the organization.

22         You will participate in a mental health treatment

23  program approved by the Probation Office and will take any

24  prescribed medications unless otherwise instructed by the mental

25  health treatment provider.  You'll contribute to the cost of

1 services rendered based on ability to pay or availability of

2 third-party payment.  I authorize the release of the mental

3 health treatment and reports, including the pre-sentence report

4 and the sentencing memoranda, to the mental health treatment

5 provider.

6           I'm imposing the mandatory $100 special assessment,

7 which is due immediately.  I am ordering restitution as agreed

8 upon in the amount of $26,098.47.  The restitution payments

9 should be made as described on page 45 of the Pre-Trial Services

10 report.

11          I've considered the factors set forth in 18 U.S.C.

12 § 3663(f)(2) and in the interest of justice, order that

13 restitution be payable in installments pursuant to 18 U.S.C.

14 §§ 3572(d) and (2).  The installments will be monthly in the

15 amount of $200 or ten percent of gross income, whichever is

16 greater, payable on the first of each month starting 30 days

17 from release from confinement.

18          The restitution obligation is joint and several with

19 Co-Defendants.  I'm imposing the $9,500 forfeiture, which has

20 already been agreed upon.  While the Defendant is in prison, he

21 will make installment payments toward his restitution obligation

22 through the -- and may do so through the Bureau of Prisons

23 financial inmate responsibility plan.

24          The Defendant must notify the clerk of court, the

25 probation office during his period of supervised release, and

1  the U.S. Attorney's Office of any change in name, residence,

2  mailing address, or any material change in financial

3  circumstances that affects ability to pay restitution and must

4  do that within 30 days of the change.

5          Based on the restitution and forfeiture obligations

6  and the Defendant's financial situation, I'm not imposing a fine

7  based on inability to pay.

8          Does either lawyer know of any legal reason why the

9  sentence I've described should not be imposed?

10         MR. FELTON:  No, your Honor.

11         MR. SAPONE:  No, your Honor.

12         THE COURT:  Then the sentence I've described is the

13 sentence I impose.  It's the sentence I find sufficient, but not

14 greater than necessary to serve the purposes of sentencing.

15         Mr. Randolph, you have the right to appeal your

16 conviction and sentence, except to the extent you've given up

17 that right through your guilty plea or your plea agreement.  If

18 you think you have grounds to appeal and you're unable to pay

19 the costs of an appeal, you can apply for permission to appeal

20 without paying.  Any notice of appeal must be filed within 14

21 days of the entry of the judgment of conviction.

22         I know you may not be happy with how this turned out.

23 From where I sit, I feel like I have shown you some grace and

24 mercy.  I could have given you eight years, and I don't think

25 anybody would have objected based on -- I mean any higher

1  court -- based on what you did while you were on release in this

2  case.  I really hope you meant everything you said today and

3  there is a way to turn this into a positive as you say you want

4  to.

5           THE DEFENDANT:  I, I --

6           THE COURT:  I would encourage you to -- you know, you

7  spoke a lot about how you want to help other people and help

8  them get their lives together and all that, and that's

9  wonderful, but it's okay to focus on you.  You got a lot of

10  stuff you're carrying around that maybe you haven't dealt with

11  yet, and I would -- this is free advice so it's worth what

12  you're paying for it, but when you get out, I would focus on

13  what you need to do to keep your promise that you won't ever be

14  in court again, and that's not going to be easy, so don't feel

15  like you have to take on the world and that you have to, you

16  know, be a saviour to the community.  It will be a very good

17  thing if you can do what you promised your wife and son just

18  now.

19           And if you get to that point, you know, where you are

20  a changed man and then you want to go out and help other people,

21  like I said, that's wonderful, but don't feel like you gotta do

22  that at the beginning.  It's fine to focus on yourself and

23  getting your life back together.

24           THE DEFENDANT:  Yes, your Honor.  Thank you, Your

25  Honor, I appreciate that, but I, I -- I'm going to keep that

1  promise to my family, and I am going to try to touch other

2  people's lives and try to help other people or whatever.  I'm

3  going to make this negative as much of a positive as I can, and

4  I'm going to move forward though that and I'm going to work

5  every day to do that.

6              THE COURT:  All right.

7              THE DEFENDANT:  I meant everything that I said.

8              THE COURT:  Good for you.  And I get totally -- I

9  totally get what you mean about you and I never seeing each

10 other again as being a positive.  I hope, I hope for the same.

11             THE DEFENDANT:  No, I, I said you're gonna see me

12 again, but I said you're gonna see me in a positive light, not a

13 negative light.

14             THE COURT:  Oh.

15             THE DEFENDANT:  Not somebody coming in your courtroom

16 again or whatever, and when you look back over your time on the

17 bench, hopefully you'll be able to say "I positively affected

18 that person's life right there and that's an example of why I do

19 what I do" or whatever.

20             THE COURT:  I hope you're right, and part of that

21 means you and I are not in a courtroom together anymore --

22             THE DEFENDANT:  Oh, of course, no, ma'am.

23             THE COURT:  -- and you're not in anybody else's

24 courtroom.

25             And you've got, you've got the tools.  You're

1  obviously a bright man, you've run a business, you're...just

2  from the way you spoke today I know you've got some good brains

3  in there, and you have had some stuff that happened to you when

4  you were a kid and it's a hundred percent not your fault, but

5  it's messed you up in some ways and made you...you know, like I

6  said, do some things that I cannot understand.

7          So I think that there is actually -- notwithstanding

8  all of the bad behavior recently, you know, there is a decent

9  chance that you can straighten things out, and I wish you the

10  best of luck.

11          Are there any open counts?

12          MR. FELTON:  Yes, your Honor, the Government moves to

13  dismiss Counts I, III, V, and IX in the indictment as to Mr.

14  Randolph.

15          THE COURT:  I, III, V, and IX are dismissed as to Mr.

16  Randolph.

17          I'm going to sign the preliminary order of forfeiture,

18  as well as the restitution order, and I think that completes our

19  business.

20          Do you want, Mr. Sapone, a geographic recommendation?

21          MR. SAPONE:  Yes, your Honor.

22          So your Honor knows that I am Mr. Randolph's voice,

23  although he actually said a few things directly to you -- by the

24  way, thank you for your kind words to him, your Honor, you

25  didn't have to say those things and I appreciate it -- he is

1  asking me to ask you if he could self-surrender to a BOP

2  facility in the area of Atlanta, Georgia, so that he could get

3  the support of his family.  They'd like to visit him, obviously,

4  while he's in the BOP.

5           And I explained to him that, you know, that is an

6  uphill battle, but he asked me to ask you if that's possible.

7           THE COURT:  Well, I will recommend a facility in the

8  Atlanta area, but there's not going to be a self-surrender based

9  on the track record while on pre-trial release.

10          All right, thank you, everyone.  Stay well.

11          MR. FELTON:  Thank you, Your Honor.

12          MR. SAPONE:  Thank you, Your Honor.

13          Certified to be a true and accurate transcript.

14          *Tabitha Dente*

15          _____

16          TABITHA DENTE, SR. COURT REPORTER

17

18

19

20

21

22

23

24

25